Filed 8/19/16  P. v. Garcia CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LOUIE GARCIA,<br><br>Defendant and Appellant. | B261526<br>(Los Angeles County<br>Super. Ct. No.  VA135297) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed in part, reversed in part and remanded with directions.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

In the underlying action, appellant Louie Garcia was convicted of ten counts of lewd act upon a child.  He contends the trial court erred in excluding several of his character witnesses, admitting evidence of prior sexual misconduct, and directing him to submit to a blood test for HIV.  We reject appellant's contentions, with the exception of his challenge to the HIV testing order.  We therefore affirm in part, reverse in part, and remand the matter for further proceedings.

## RELEVANT PROCEDURAL HISTORY

On July 10, 2014, a 10-count information was filed, charging appellant with lewd acts upon his granddaughter (Pen. Code§ 288, subd. (a)).[1]  Appellant pleaded not guilty to all counts.  A jury found appellant guilty as charged.  The court sentenced appellant to an aggregate term of 14 years.  In imposing that sentence, the court ordered appellant to submit to an HIV test (§ 1202.1).

## FACTS

A. *Prosecution Evidence*

    1. *Prior Sexual Misconduct*

G.P., born 1980, and Amber P., born 1982, are sisters and appellant's nieces.  While children, they often visited appellant and his wife, who is their mother's sister.

Amber testified that on one occasion, when she was seven or eight, her father arranged for her to spend the night at appellant's house.  Amber's grandmother was also in the house.  When Amber awoke, she went to the living

---

[1]    All statutory citations are to the Penal Code.

2

room, where appellant was watching television. While Amber lay on the floor in front of the television, appellant pushed his hands under her underwear and fondled her genitalia. Amber immediately described the incident to her grandmother. She did not relate the incident to her parents until she was approximately 12 years old.[2] The incident was never reported to the police.

G. testified that when she was 11 years old, she was watching television with appellant in his living room late one night. Also present were appellant's children, Luis G. and Christina G.-C., who were asleep.[3] When appellant asked whether G. wanted a massage, she agreed. He unsnapped her bra, manipulated her breasts, and then left the room.

Later, on another occasion, when G. was dressed in shorts, appellant asked her to grab something from the upper shelves of a hallway cupboard. He lifted her onto his back, pulling her legs so that her private parts rubbed the back of his neck. He then massaged the bottom and top of her legs.

G. made no immediate report of either incident. When she was 13 years old, her mother asked her whether appellant had ever touched her inappropriately. G. replied in the negative because she felt ashamed and did not want to cause problems for her family.

### 2. *Current Offenses*

B.G. is appellant's granddaughter. She was born in 2000 to Erika T. and Luis G., appellant's son. When B.G. was two years old, Erika and Luis separated.

---

[2]     M.P., Amber's mother, testified that when 12 years old, Amber told her that appellant had once pulled down her underpants and touched her private parts.

[3]     The record also refers to Luis G. as "Louie" or "Louie, Jr."

After their separation, B.G. sometimes visited appellant.

Erika testified that when B.G. was 12 years old, she started "acting out." B.G. failed to do her homework, took a pair of Erika's earrings, and stole another student's homework. In May 2014, B.G. sent inappropriate photos to a boy. After Luis and Erika imposed punishment for that incident, Erika learned that B.G. had made allegations regarding appellant to her school counselor.

B.G. testified that appellant touched her inappropriately on eleven occasions spanning four years, commencing when she was ten years old and in the fifth grade. The first two times occurred while she was spending the night at appellant's house. During the first incident, appellant approached B.G., put his hand under her pajamas, rubbed her breast and vagina, and left. A month later, appellant again approached her, rubbed her back, placed his fingers in her vagina, and left.

The third and fourth incidents occurred while B.G. was in the sixth grade. During the daytime, while she was seated on a bed using a laptop computer, appellant rubbed her thigh and touched her vagina and breasts. Two weeks later, while B.G. was watching television at night in her bedroom, appellant began rubbing her shoulders, moved his hands until he rubbed her vagina, and put his fingers inside it.

The fifth and sixth incidents occurred the summer before B.G. began the seventh grade. On one occasion, during the daytime, she was using a laptop computer while seated on her grandparents' bed. Appellant entered the room, rubbed her back and "butt," and left the room. On another occasion, appellant entered her room during the night, rubbed her back and "butt," and placed his fingers in her vagina.

The seventh and eighth incidents occurred while B.G. was in the seventh

4

grade. After the end of school, while B.G. waited for her parents to pick her up at appellant's house, she watched television in her grandmother's room. Appellant rubbed her shoulders, and then rubbed her vagina. On another occasion, when she watched television while waiting for her parents, he rubbed her back and breast.

The final three incidents occurred after B.G. completed the seventh grade. During the summer before she commenced the eighth grade, appellant entered her bedroom at night, put his hand under her clothing, rubbed her "butt," and placed in his fingers in her vagina. In September 2013, when B.G. began the eighth grade, she waited after school at appellant's house for her parents to pick her up. As she watched television and used a laptop in her grandmother's room, appellant rubbed her back, breast, and vagina. In February 2014, while in the eighth grade, B.G. spent the night at appellant's house. He entered her bedroom, put his hands under her nightgown, and rubbed her legs, breast, and vagina.

Prior to 2014, B.G. did not report appellant's misconduct because she feared that no one would believe her. After the February 2014 incident, B.G. described appellant's actions to a friend, who advised her to tell the school counselor. In May 2014, B.G. reported appellant's abuse to the counselor.


B. *Defense Evidence*

Appellant denied engaging in any type of sexual misconduct with B.G., Amber, or G. He stated that Amber and G. had long felt acrimony toward him due to incidents during which he had disciplined or exercised appropriate control over them when they were children.

Christina G.-C., appellant's daughter, testified that she lived with her parents during the period described by Amber P. and G.P. According to Christina, neither Amber nor G. related any misconduct by appellant to her, and she saw no

5

unusual interactions between them and appellant. Christina could not recall ever watching a movie with her brother Luis, appellant, and G.

Christina further testified that she lived continuously with her parents after 2007, when she separated from her husband. During that period, she had a close relationship with B.G., and was involved with B.G. when she developed behavioral issues in junior high. According to Christina, while in the fifth and sixth grades, B.G. never spent the night at appellant's house, due to a "family feud." Later, when B.G. began overnight visits there, she always wanted to make the visits, displayed affection to appellant, and never suggested any misconduct by him. Christina was frequently present when B.G. was in appellant's house, but saw no unusual changes in B.G.'s conduct toward appellant. In the seventh and eighth grades, B.G. stole jewelry, small sums of money, and other items from Christina, and repeatedly denied that misconduct.

Luis G. testified that in the 1980's and early 1990's, Amber P. and G.P. frequently visited his parents, with whom he then lived. During that period, they never related any misconduct by appellant to him. Luis stated that it was unlikely that in 1991, he and Christina fell asleep while watching a movie with appellant and G. because Christina was rarely at home.

Luis G. further testified that B.G. manifested behavioral issues before she began the fourth grade. According to Luis, she stole items and told lies. When B.G. was in the fourth and fifth grades, she lived with Erika and had little contact with appellant. Later, while B.G. was in the sixth grade, Luis's relationship with Erika improved, and he occasionally took B.G. to appellant's house. Shortly before B.G. commenced the seventh grade, she began living with Luis and K.K., his girlfriend. Although B.G. began visiting appellant's house on a regular basis, she never suggested that appellant engaged in misconduct with her. B.G.'s

6

behavioral problems nonetheless continued at her school. When Luis learned that B.G. had sent inappropriate photos to a boy, Luis told her that he intended to punish her. The following day, Luis learned that B.G. had made accusations regarding appellant to her school counselor.

K.K. testified that she helped Luis care for B.G. While in the seventh grade, B.G. often waited in appellant's house after school for K.K. to drive her home. K.K. never noticed anything unusual when she picked B.G. up at appellant's house.

Breanna G., B.G.'s older sister, testified that appellant had been a good grandfather to her, and had never touched her inappropriately. According to Breanna, she never saw any unusual interactions between appellant and B.G.

Geraldine G., appellant's wife, testified that prior to May 2014, when B.G. asserted her accusations against appellant, no one ever suggested that he had engaged in misconduct.

Appellant also presented testimony from five character witnesses. Valorie Ann Vasquez, appellant's niece, testified that she had a close and loving relationship with him for over 30 years. Appellant's neighbors, Todd Wilderman and Laura Almaraz-Wilderman, testifed that they had known appellant for many years, and that their daughter had often visited him. They regarded appellant as honest and trustworthy. Rocio Rubalcava, a longtime friend of Christina G.-C., stated that appellant was "an amazing father and grandparent." Yolanda Gonzales testified that she had known appellant for over 37 years, and believed him to be honest and trustworthy.

7

**DISCUSSION**

Appellant contends (1) that the trial court erroneously limited his presentation of character witnesses, (2) that the evidence of his prior misconduct with Amber and G. was improperly admitted, and (3) that there was insufficient evidence to support the HIV testing order. As explained below, we rejected his contentions, with the exception of his challenge to the HIV testing order.

A. *Character Witnesses*

Appellant contends the trial court improperly limited the number of character witnesses he was permitted to call at trial, arguing that the excluded testimony was necessary to establish that his own testimony was more credible than that provided by B.G. He maintains the court's ruling contravened his right to present a defense and his right to a fair trial under the Sixth Amendment to the United States Constitution. As explained below, he has failed to show error in the ruling.

1. *Governing Principles*

Generally, defendants have a fundamental right to call witnesses in their defense. (*People v. Cudjo* (1993) 6 Cal.4th 585, 638.) Furthermore, notwithstanding the limitation on the admission of character evidence set forth in section 1101 of the Evidence Code, section 1102 of that code permits a defendant in a criminal action to offer such evidence when relevant to showing his or her innocence of the crime charged.[4] (*People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516, 526.)

---

[4]     Evidence Code section 1101 states that except as provided in certain enumerated sections (including sections 1102 and 1108), "evidence of a person's
*(Fn. continued on next page.)*

8

The defendant's right to call character witnesses is nonetheless subject to the trial court's authority to regulate the admission of evidence. (See *People v. Jones* (1998) 17 Cal.4th 279, 304.) In this context, " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' [Citation.]" (*Id*. at p. 305.) Evidence Code section 352 authorizes the trial court to exclude testimony from character witnesses when the time consumed presenting it outweighs its probative value.[5] (See *Jones*, *supra*, 17 Cal.4th at pp. 304-305.)

Generally, in order to preserve a contention of error regarding the exclusion of a character witness, the defendant must make a sufficient offer of proof. (See *People v. Earp* (1999) 20 Cal.4th 826, 891-892.) "An appellate court may not reverse a judgment because of the erroneous exclusion of evidence unless the 'substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means.'"

---

character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).)

Evidence Code section 1102 states in pertinent part: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by [s]ection 1101 if such evidence is: [¶] (a) [o]ffered by the defendant to prove his conduct in conformity with such character or trait of character."

[5] Under Evidence Code section 352, the trial court has the discretion to exclude evidence when "the probative value of particular evidence is outweighed

*(Fn. continued on next page.)*

(*People v. Livaditis* (1992) 2 Cal.4th 759, 778, italics omitted, quoting Evid. Code, § 354, subd. (a).)  As explained in *People v. Schmies* (1996) 44 Cal.App.4th 38, 53, "[a]n offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of [an] appeal[,] would provide the reviewing court with the means of determining error and assessing prejudice.  [Citation.]  To accomplish these purposes an offer of proof must be specific.  It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued."

### 2. *Underlying Proceedings*

At an unreported conference, the trial court ruled that appellant would be permitted to call four witnesses to establish his good character.  Appellant then presented testimony regarding his honesty, trustworthiness, and good moral character from his niece (Valorie Ann Vasquez), two neighbors (Todd Wilderman and Laura Almaraz-Wilderman), and his daughter's friend (Rocio Rubalcava).

Following those witnesses, the trial court conducted a chambers conference at the request of defense counsel, who stated that his plan was to call six character witnesses.  The court noted its prior ruling, and observed that the four character witnesses were "directly on point."  The following exchange then ensued:

"[Defense counsel]:  . . . I submitted a witness list of some 33 people with probably up to 20 fewer [sic] character witnesses, in other words, witnesses who as these last four [ . . . . ] I am simply asking briefly about their interaction with [appellant] and an opinion as to his character. [¶] . . .  I would propose to call two

_____

by concerns of undue prejudice, confusion or consumption of time.  [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 (*Rodrigues*).)

10

more only of these witnesses, Yolanda Gonzales and Rachel Hernandez, and they would both be very brief. *They are in the same vein. I guess there is some repetition.* However, I have done my best to really hone down.

"The court: You have. It's not a criticism of you by my ruling at all.

"[Defense counsel]: . . . And let me just tell you what I am faced with as I go into the hall. There is a number of people out there, and they are upset with me that I am unable to put on more character witnesses.

"The court: Well, I will be happy to make a record at some point in time with the whole family to hear it. I agree I have made some rulings that have limited you. This other young lady, is she independent of the family witnesses? [¶] . . . [¶]

"[Defense counsel]: Yes. Yolanda Gonzales is a legal assistant who is a friend of the family and has . . . known [appellant] for 37 years . . . .

"The court: I will let you call that one, but that's it.

"[Defense counsel]: Okay." (Italics added.)

Following the conference, Gonzales testified to her lengthy association with appellant and her belief that he was honest and trustworthy. Later, in open court, the trial court informed appellant's family that it had limited the number of witnesses in order to prevent the case from becoming "so convoluted that the jury loses focus."

### 3. *Analysis*

Appellant contends the trial court's ruling "eviscerated [his] defense by slashing 15 of his credibility witnesses." In our view, appellant has forfeited his contention, as the record discloses no adequate offer of proof regarding those witnesses.

11

As explained in *People v. Anderson* (2001) 25 Cal.4th 543, 579-580 (*Anderson*), in order to preserve a challenge to the exclusion of testimony from a defense witness, the defendant must make an adequate offer of proof. There, during the prosecution's case-in-chief, when the prosecutor offered testimony from a witness to the underlying murder, the defendant's counsel told the trial court that he was likely to call the witness's husband in order to impeach her. (*Ibid*.) After the husband stated his intention to assert his marital privilege (Evid. Code, § 970), the trial court ruled that it would uphold that privilege if invoked. (*Id*. at p. 580.) As a result of the ruling, defense counsel did not call the husband as a witness. (*Ibid*.)

On appeal, the defendant contended the ruling regarding the marital privilege was erroneous and denied his constitutional rights to a fair trial. (*Anderson*, *supra*, 25 Cal.4th at pp. 579-580.) Our Supreme Court held that the contention had been forfeited for want of an adequate offer of proof, because defense counsel had merely explained why the husband might be called, without showing what material testimony he would provide. (*Ibid*.) As the court observed, due to the absence of an adequate offer of proof, the defendant "failed to make a record that permits a finding he was prejudiced by the loss of [the husband's] testimony." (*Id*. at p. 581.)

The same is true here. The record discloses no description whatsoever of the proposed testimony of 14 of the 15 potential witnesses. Regarding Rachel Hernandez, the fifteenth witness, defense counsel stated only that her proposed testimony would be "in the same vein" as the testimony from Gonzales and the other character witnesses, and he acknowledged "some repetition." That description lacks the specific details that would enable a reviewing court to

12

determine whether the exclusion of Hernandez's testimony was prejudicial. Appellant has thus failed to preserve his contention.**6**

For similar reasons, were we to examine appellant's contention, we would conclude that the trial court did not err in excluding the testimony. Under the circumstances, appellant was obliged to make a threshold showing of the excluded evidence's probative value, for purposes of establishing its admissibility under Evidence Code section 352. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684-685 [notwithstanding defendant's constitutional right to present a defense, proffered evidence was properly excluded under Evidence Code section 352 because defendant's offer of proof showed only that it supported a speculative inference].) This appellant did not do. Because he did not describe the proposed testimony from 14 of the 15 witnesses, the trial court did not err in excluding that testimony, as there was no showing regarding its probative value. (See *ibid*.) Although defense counsel briefly characterized Hernandez's proposed testimony, he stated

---

**6**    The record's insufficiency to establish prejudice is also fatal to appellant's suggestion that defense counsel rendered ineffective assistance in failing to preserve the contention. "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails. Moreover, "'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." [Citation.]' [Citation.]" (*Rodrigues*, *supra*, 8 Cal.4th at p. 1126, quoting *People v. Cox* (1991) 53 Cal.3d 618, 656, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Because the record before us does not establish prejudice from the exclusion of the proposed testimony, appellant has not shown ineffective assistance of counsel.

only that it would be "in the same vein" as that offered by other witnesses, with "some repetition." In view of that characterization, the trial court reasonably concluded that Hernandez's proposed testimony was merely cumulative. To the extent appellant suggests he was entitled to call an unlimited number of character witnesses, the law is to the contrary. (*People v. Hendrix* (1923) 192 Cal. 441, 451 [trial court properly excluded witnesses offering only cumulative character testimony]; *People v. Burke* (1912) 18 Cal.App. 72, 89-90 [same]; see *People v. Peak* (1944) 66 Cal.App.2d 894, 907, disapproved on another ground in *People v. Carmen* (1951) 36 Cal.2d 768, 775-776 ["The general rule is that if a party is not prejudiced thereby the court in its discretion may limit the number of witnesses . . . to prove a particular link in a chain of evidence"].) In sum, appellant has shown no error in the court's evidentiary ruling.

## B. *Admission of Prior Sexual Misconduct*

Appellant contends the trial court erred in admitting evidence of appellant's prior sexual misconduct involving Amber and G. under Evidence Code sections 1108 and 352. For the reasons explained below, we reject the contention.

### 1. *Governing Principles*

Subdivision (a) of Evidence Code section 1108 provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence Code s]ection 352." Subdivision (d)(1)(A) of Evidence Code section 1108 defines "'[s]exual offense'" to include lewd acts on a child or dependent (§ 288, subd. (b)). As our Supreme Court has explained, Evidence

14

Code section 1108 authorizes the admission of charged and uncharged prior sexual offenses. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159-1161.)

In determining whether to admit evidence of appellant's prior misconduct under Evidence Code sections 1108 and 352, the trial court was obliged to consider "its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the [trier of fact] . . . , its similarity to the charged offense, its likely prejudicial impact on the [trier of fact], the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . . [Citations.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) The court's ruling is reviewed for an abuse of discretion. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

"[T]he Legislature's principal justification for adopting [Evidence Code] section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. [Evidence Code s]ection 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes. [Citation.]" (*Falsetta*, *supra*, 21 Cal.4th at p. 915.)

Evidence Code Section 1108 marks a departure from Evidence Code section 1101, which limits the admission of prior criminal conduct. As our Supreme Court has explained, "[b]efore [Evidence Code] section 1108 was enacted, Evidence Code section 1101 governed the admission of prior criminal conduct, and a body of law developed concerning how similar the prior conduct had to be to the charged crime; the required degree of similarity varied depending on the use

15

for which the evidence was offered. [Citation.] 'All of that radically changed with respect to sex crime prosecutions with the advent of section 1108 . . . . [Evidence Code s]ection 1108 now "permit[s] the jury in sex offense . . . cases to consider evidence of prior offenses *for any relevant purpose"* [citation], subject only to the prejudicial effect versus probative value weighing process required by [Evidence Code] section 352.' [Citation.] 'In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101.' [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 63 (*Loy*).)

### 2. *Analysis*

Here, the trial court admitted the evidence relating to Amber and G. over appellant's objection that the pertinent incidents were too remote in time and too dissimilar from the misconduct charged against him. We see no error in that ruling.

In *People v. Soto* (1998) 64 Cal.App.4th 966, 969-970 (*Soto*), the defendant was charged with lewd conduct with a child under the age of 14 years (§ 288, subd. (a)) and other sexual offenses involving his 12-year-old niece. At trial, the niece testified that the defendant placed his hands under her clothes, touched her breasts, placed his fingers in her vagina, and exposed his penis to her. (*Soto, supra,* 64 Cal.App.4th at pp. 971-972, 977.) In addition, the prosecution presented evidence of the defendant's prior uncharged sexual offenses involving another niece and the defendant's younger sister. (*Id*. at pp. 977-981.) The niece testified that approximately 20 or 21 years earlier, when she was four or five years old, the defendant licked her private areas while she was naked and took photographs of

16

her.  (*Id*. at pp. 977-978.)  The defendant's sister testified that approximately 30 years earlier, when she was seven or eight years old, the defendant kissed her and placed his finger in her vagina.  (*Id*. at pp. 978-979.)  Both victims concealed the incidents for many years, and the defendant was never prosecuted for them.  (*Ibid*.)  The appellate court held that the prior incidents were properly admitted under Evidence Code sections 1108 and 352, concluding that notwithstanding their temporal remoteness, they were sufficiently similar to the charged misconduct and involved victims "within the same age range."  (*Soto, supra,* 64 Cal.App.4th at pp. 990-992.)

In *People v. Branch* (2001) 91 Cal.App.4th 274, 277-278 (*Branch*), the defendant was charged with lewd conduct with a child under the age of 14 years and a related offense involving his wife's 12-year-old great granddaughter.  At trial, the victim testified that the defendant put his hand under her clothing and placed fingers in her vagina while moving his other hand under his pants.  (*Id*. at p. 278.)  The victim's grandmother testified that approximately 30 years before that incident, when she was between the ages of 12 and 15, the defendant repeatedly rubbed her breasts and vagina while touching himself under his pants.  (*Id*. at pp. 278-279.)  The appellate court concluded that those prior uncharged offenses were properly admitted under Evidence Code sections 1108 and 352 despite the 30-year gap between them and the charged offenses, as the incidents were "remarkably similar."  (*Branch, supra,* 91 Cal.App.4th at pp. 281-287.)

Here, Amber's and G.'s testimony is on a par with the testimony at issue in *Soto* and *Branch*.  The misconduct charged against appellant involved B.G., who testified that when she was between the ages of 10 and 14, appellant repeatedly placed his hand under her clothing, rubbed her breasts and vagina, and put his fingers in her vagina.  Amber testified that approximately 20 to 25 years prior to

17

the charged misconduct, when she was seven or eight, appellant placed his hands under her underwear and rubbed her genitalia. G. testified that approximately 20 years prior to the charged misconduct, when she was 11 years old, appellant touched her breasts, and on a later occasion, touched her legs and private parts. In view of *Soto* and *Branch*, those incidents were properly admitted under Evidence Code sections 1108 and 352, as they involved conduct similar to that charged in the instant case and victims "within the same age range" (*Soto*, *supra*, 64 Cal.App.4th at pp. 990-992).

The decisions upon which appellant relies are distinguishable. In *People v. Harris* (1998) 60 Cal.App.4th 727, 730-731, the defendant, a mental health nurse, was charged with sexual misconduct with female patients who were vulnerable due to their mental condition. The trial court admitted evidence under Evidence Code section 1101 that over 20 years earlier the defendant had brutally raped a woman who had never been one of his patients. (*Harris, supra,* 60 Cal.App.4th at pp. 733-736, 739.) The appellate court concluded that admitting the evidence was error because the rape was inflammatory, remote in time, and unlike the misconduct with which the defendant was then charged. (*Id*. at p. 741.) Here, in contrast, the offenses charged against appellant resemble his prior uncharged offenses.

In *People v. Abilez* (2007) 41 Cal.4th 472, 481-485 (*Abilez*), the defendant and a co-defendant were charged with the 1996 sodomy and murder of the defendant's mother. At trial, the court excluded evidence of the co-defendant's 1973 conviction as a juvenile for attempted unlawful intercourse with a minor, which the defendant offered to establish that the co-defendant was responsible for the sodomy. (*Id*. at pp. 498, 500.) In affirming that ruling under Evidence Code sections 1101 and 1108, our Supreme Court placed special emphasis on the

18

dissimilarity between the 1973 and 1996 crimes and the temporal gap between them. (*Abilez, supra,* 41 Cal.4th at pp. 501-502.) Regarding Evidence Code section 1101, the court determined that "the inference that the person who attempted to have sex with a minor more than 20 years earlier was likely to be the person who sodomized and killed the 68-year-old victim here is weak." (*Abilez, supra,* at p. 501.) The court reached a similar conclusion regarding Evidence Code section 1108, stating: "[T]he lack of similarity between [the] 1973 adjudication and the present crimes justified exclusion of the evidence. This conclusion is bolstered by the remoteness of the 1973 adjudication." (*Abilez, supra,* at p. 502.)

*Abilez* is of no assistance to appellant. "Because of the 'broad discretion' trial courts have under [Evidence Code] section 1108 [citation], a finding of no abuse of discretion in one court's exclusion of evidence has no bearing on whether a different court abused its discretion in admitting evidence in a different trial." (*Loy*, *supra*, 52 Cal.4th at p. 64.) Furthermore, the prior uncharged offenses at issue here were not offered to establish the perpetrator's identity, but to show that appellant had the propensity to commit the charged offenses. As explained above, for that purpose, the prior misconduct was sufficiently similar to the charged offenses, despite its temporal remoteness.

In *People v. Kelley* (1967) 66 Cal.2d 232, 236 (*Kelley*), the defendant was charged with lewd acts with a child and related offense involving his eight-year-old stepson. At trial, evidence was presented that the defendant had admitted to engaging in prior sexual activities with several people, including oral copulation with a man. (*Id*. at p. 237.) In concluding that the evidence's admission contravened the rule proscribing evidence offered solely to prove a criminal disposition, our Supreme Court determined that the evidence fell outside an

exception to the rule for evidence offered to establish intent. (*Id*. at pp. 238-244.)

As explained above (see pt. B.1. of the Discussion, *ante*), Evidence Code section 1108 constitutes an exception to the rule at issue in *Kelley* for evidence offered to show that a defendant has a "disposition to commit sex crimes" (*Falsetta*, *supra*, 21 Cal.4th at p. 915). Because *Kelley* predates the enactment of that statute, it is inapplicable here. In sum, the trial court did not err in admitting the evidence of appellant's prior sexual misconduct involving Amber and G.

### C. *HIV Testing Order*

Appellant contends the HIV testing order must be stricken, because there is insufficient evidence to support it. As explained below, we agree.

"Penal Code section 1202.1 provides in relevant part that '[n]otwithstanding Sections 120975 and 120990 of the Health and Safety Code, the court shall order every person who is convicted of . . . a sexual offense listed in subdivision (e) . . . to submit to a blood . . . test for evidence of antibodies to the probable causative agent of acquired immune deficiency syndrome (AIDS) . . . . ' (Pen. Code, § 1202.1, subd. (a).) Penal Code section 1202.1, subdivision (e)(6)(A)(iii) includes '[l]ewd or lascivious conduct with a child in violation of Section 288,'[] but with the proviso that testing shall be ordered only 'if the court finds that there is probable cause to believe that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim: [¶] . . . [¶] For purposes of this paragraph, the court shall note its finding on the court docket and minute order if one is prepared.' (Pen. Code, § 1202.1, subd. (e)(6)(A), (B).)" (*People v. Stowell* (2003) 31 Cal.4th 1107, 1112, fn. omitted.)

The order has consequences beyond the authorization of HIV testing. (*People v. Butler* (2003) 31 Cal.4th 1119, 1127 (*Butler*).) "Under specified

circumstances, test results must also be disclosed to defense counsel and the prosecutor. (Pen.Code, § 1202.1, subd. (c).)" (*Butler*, *supra*, 31 Cal.4th at pp. 1128-1129.) The order also has other potential consequences under certain sentencing statutes. (*Ibid.*) "Without a valid order, enforcement of these additional provisions would be precluded. [Citations.]" (*Id.* at p. 1129.)

Here, the trial court ordered appellant to provide a blood sample for HIV testing, but made no express "probable cause" finding. For that reason, we imply that finding and examine the record for substantial evidence to support it. (*Butler*, *supra*, 31 Cal.4th at p. 1127.) No such evidence is disclosed in the record, as none of appellant's offenses appears to have involved the transference of a bodily fluid capable of transmitting HIV. The HIV testing order thus fails for want of substantial evidence. Respondent does not dispute this conclusion.

The remaining question concerns the appropriate remedy. As our Supreme Court has explained, section 1202.1 is part of a statutory scheme intended to combat the further spread of HIV infection, which constitutes a major health care crisis. (*Butler*, *supra*, 31 Cal.4th at p. 1129.) In view of those "significant public policy considerations," the correct remedy is to strike the order and remand the matter for further proceedings at the election of the prosecution, in order to permit the prosecution to submit additional evidence sufficient to support the order. (*Id.* at p. 1129.) Pending such a showing, the stricken order may not be relied upon for any purpose dependent on its validity. (See *id.* at p. 1129.)

### DISPOSITION

The judgment is affirmed in all respects, with the exception of the HIV testing order, which is stricken. The matter is remanded for further proceedings relating to HIV testing at the election of the prosecution in accordance with this

opinion, with directions to the trial court to order that no test results based on the stricken order may be employed or disclosed for any statutorily authorized purpose, unless and until the prosecution submits additional evidence sufficient to support an HIV testing order.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


WILLHITE, Acting P. J.


COLLINS, J.